## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA,
## GAINESVILLE DIVISION

**ANTHONÉ T. GERENIS,**                                    **Case No.:**

**Plaintiff,**

**v.**

**THE COLLIER COMPANIES, INC.**

**A Florida Corporation,**

**Defendant.**

_____/

## PLAINTIFF ANTHONÉ T. GERENIS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Anthoné T. Gerenis, by and through his undersigned counsel, files this, his complaint and demand for jury trial against Defendant, The Collier Companies, Inc. a Florida corporation (hereinafter, "Defendant"), an employer as defined in the state of Florida, and states as follows in support thereof:

## NATURE OF THE ACTION

1. This is a proceeding for damages and injunctive relief to redress the deprivation of rights secured to Plaintiff regarding his gender by the Civil Rights Act of 1964 42 U.S.C. 2000e et seq well as with regard to his gender per the Florida Civil Rights Act F.S. 760.10.

## PARTIES

2. Anthoné T. Gerenis is an African American man currently residing in Alachua County, Florida. He is a citizen of the United States and a resident of the state of Florida. Plaintiff is a person entitled to protection pursuant to the provisions of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq.

3. During all relevant times, Plaintiff was an employee of Defendant.

4. Defendant is a corporation that operates a residential and dormitory leasing corporation located in Alachua County, Florida.

5. At all times relevant to the allegations in this Complaint, Defendant operated from that facility in Gainesville, Florida.

6. At all relevant times, Defendant employed more than 15 people.

## JURISDICTION

7. This Court has jurisdiction over this matter under 28 U.S.C. § 1331 as this matter involves a federal question based upon 29 U.S.C. §§ 621 et seq. This Honorable Court has jurisdiction over this matter as this case arises under the equal protection clause of the Fourteenth Amendment to the United States Constitution and poses a question of federal law.

8. The Gainesville District Court is the proper venue for this action under 28 U.S.C. §1391 (b)(l) and (b)(2) because this is the District and Division in which a substantial part of the events or omissions giving rise to the claims occurred.

## VENUE

9. The unlawful employment practices alleged below were within the state of Florida in Gainesville. Accordingly, the venue lies in the United States District Court for the Northern District of Florida, Gainesville Division under 29 U.S.C. § 1391(b) and 28 U.S.C. § 1391(a).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. Plaintiff filed this action timely, as was his right, after receiving a written notice of right to sue from the U.S. Equal Employment Opportunity Commission, Tampa District office.  A copy of said decision is attached hereto and marked Exhibit "A." Said Exhibit "A" is incorporated herein as though set forth in full. Plaintiff regrets said EEOC has failed to effect voluntary compliance with the requirements of the 42 U.S.C. ch. 126 § 12101 et seq. and The Civil Rights Act of 1964, as amended, 42 U.S.C. § 20003 et seq. on the part of said Defendant.

## STATEMENT OF FACTS

## Plaintiff's employment background

11.    On Wednesday, June 3, 2009, as a community college student, Mr. Gerenis began employment with Paradigm Properties Management Team, now The Collier Companies, as a Part-Time Leasing Professional at Bivens Cove Apartments in Gainesville, FL, at $7.25/hour.

12.  In or around March 2010, Mr. Gerenis was promoted to The Enclave Apartments at Mr. Nathan Collier's recommendation, the owner based on Mr. Gerenis' leasing performance, supervisor reviews and Defendant owner's secret shop of Mr. Gerenis. Mr. Gerenis receives an hourly pay raise and an increase in leasing bonuses as a result.

13.  In December 2010, Mr. Gerenis was awarded the 2010 Office Team Member of the Year for The Collier Companies. It was rewarded to the top-performing employee over four quarters and was chosen out of 450 employees. Nominees are nominated by their supervisors based on various factors, including performance, supervisor and peer review, compliance with training and other metrics.

14.  In January 2011, Mr. Gerenis was promoted to Senior Leasing Specialist and received an increase in hourly pay.

4

15.  In April 2011, after completing a Bachelor's Degree at the University of Florida, Mr. Gerenis is promoted to Assistant Manager with an increase in pay as a salaried full-time employee.

16.  In December 2011, Mr. Gerenis is promoted from a salaried exempt position working onsite at one of the properties to an hourly non-exempt position working at the main office headquarters. This operations role provided new access to headquarters, the executive team, all operations departments like human resources, IT, accounting and marketing. This role required extensive traveling to all the properties the company owned, managed and operated.

17.  In or around January through July 2012, Mr. Gerenis was first introduced to Michael J. Still. Assigned by headquarters to report to Mr. Still and assist all of his properties in Tallahassee, FL. Mr. Still managed the most extensive portfolio of properties in the company and had the most team members under his purview as a supervisor.

18.  In or around January through July 2012, Mr. Gerenis traveled between the properties in Tallahassee and was made aware of complaints involving sexual harassment and unfair treatment involving Mr. Still and one of his managers working for him.

19.   Mr. Gerenis relayed the information to headquarters and was informed an investigation was underway.

20.   Aware that The Collier Companies was now investigating the complaints made against Michael J. Still, Mr. Gerenis moved forward with his work with the company.

21.   Subsequently, Dianna Miner (President of The Collier Companies) along with Mark Wilkie (Vice president of Operations) and after consulting with other executive team members (Nathan Collier-Owner and Chairman, James Andrew Hogshead-CEO, Jennifer Clince-President of Operations and Elizabeth K. Guynn-HR Director) drove from Gainesville, FL to Tallahassee, FL and came to an agreement with Michael J. Still that resulted in his immediate separation from the company.

22.   In July 2012, after Michael J. Still was terminated, Mr. Gerenis continued being promoted up the corporate office ranks based on his performance and stats.  Mr. Gerenis received a rate of pay increases along the way as well.

23.  In March 2014, Mr. Gerenis was promoted to a senior position with a pay increase and more responsibility and management duties and a

change from a non-exempt hourly employee back to a salaried exempt employee.

24. In August 2014, Mr. Gerenis was promoted to Director of Sales and Leasing. Rate of a pay increase to include $70,000 base pay, $20,000 bonus pay, $10,000 housing concession and other benefits, marking the first time Mr. Gerenis' compensation package was valued at $100k.

25. In June 2015, Mr. Gerenis obtained an industry certification as a Certified Apartment Manager.

26. In December 2016, Mr. Gerenis was nominated for and won the Corporate Support Staff Person of the Year based on his work at The Collier Companies. The North Central Florida Apartment Association distributes this annual award. Their peers nominate nominees, and a group of industry leaders selects the winner.

27. In May 2017, Mr. Gerenis notified The Collier Companies that he was resigning.

28. In June 2017, Mr. Gerenis obtained another industry certification, this time as a Certified Apartment Portfolio Supervisor.

29. On July 6, 2017, Mr. Gerenis relocated from Gainesville, FL to Pittsburgh, PA.

30.  On July 28, 2017, five years after terminating Mr. Still for complaints involving sexual harassment and misconduct, The Collier Companies extends an employment offer to Mr. Still to return to the company in a higher role than he was in before.  As vice president of Operations, ironically upon successful background completion. His base pay was $130,000 with a $20,000 target bonus.

31.  In April 2018, after working in Pittsburgh for a different company for several months, Mr. Gerenis was approached by The Collier Companies and asked to apply for and offered a Human Resources position with a start date of June 18, 2018. Tenure was re-established and given back June 3, 2009 hire date for seniority purposes.

## STATEMENT OF CLAIMS

## COUNT I: SEX DISCRIMINATION

32.  In or around July 2018, Mr. Gerenis began to experience sexual harassment while reporting to Mr. Still.

33.  Mr. Still would consistently use sexually charged language and describe sexual situations while in their meetings, when running into each other in the hallway, and most frequently when working late while fewer people were in the building.

34.   In meetings, Mr. Still would ask Mr. Gerenis about personal and descriptive details regarding his sex life and inquire whether he is having enough sex. Mr. Still would describe his sexual desires and his need to have sex with younger men. He would constantly talk about being called a "daddy" and finding other men that would like to call him that.  Mr. Still would make sexually charged comments about Mr. Gerenis' genitals and frequently inquire about whom in the company was "playing on our team" and would be down to have some fun.

35.  In or around August 2018, the sexually charged language and verbal harassment escalated into physical touching against Mr. Gerenis' will.

36.   During this month, Mr. Still engaged frequently in touching Mr. Gerenis' inner thigh, shoulder and lower back, as well as displays of sexual advances in the form of a physical erection.

37.  In or around August 2018, Mr. Still insisted that Mr. Gerenis leave the office in the middle of the workday to ride with him in his car for a quick errand and then, upon returning to the office parking lot, started feeling up, Mr. Gerenis' inner thigh and grabbed his genitals with his right hand.

38.  Mr. Gerenis froze, and then when he attempted to exit the vehicle, Mr. Still quickly locked the door and asked if everything we were okay. After manually unlocking the door, Mr. Gerenis promptly exited the car and entered The Collier Companies offices through the side door with keypad entry.

39.  In or around late August 2018, after the incident in Mr. Still's vehicle Mr. Gerenis was surprised with an invitation to attend the first football game of the season in the Executive company box at the stadium.

40.  Mr. Gerenis attended the game and was surprised to see Mr. Still in attendance.

41.  Mr. Still made it clear to Mr. Gerenis that he was the reason he was invited, and he should be grateful to Mr. Still. Mr. Still's behavior at the football game was inappropriate and sexually charged.

42.  Mr. Still invited himself to go along with Mr. Gerenis, Mr. Gerenis' partner and approximately four or more of Mr. Gerenis' friends to Ginnie Springs to go tubing down the river.

43.  In or around early September 2018, Mr. Gerenis was in Mr. Still's office seeking approval for his trainings to be given company-wide.

44.  Ms. Guynn informed Mr. Gerenis that his work required approval by Mr. Still. At one point, as it frequently did, the conversation turned sexual.

45.  Mr. Still began telling Mr. Gerenis about his sexual conquests with men in their 20's and demanded to know who else in the company was gay.

46.  At this point, Mr. Gerenis was sitting close to the edge of his desk so he can see Mr. Still's computer screen for training materials. Mr. Still rolled his computer chair back and spread his legs to reveal he was sexually excited.

47.  Mr. Still would sometimes like to show his erection or graze Mr. Gerenis with his crotch while in passing. He again asked whom he could sleep with in the company, caress Mr. Gerenis' thigh, moved up to his crotch, and grabbed it.

48.  Mr. Gerenis said no, asked him to stop and told him he did not feel comfortable revealing that information to Mr. Still.

49.  Mr. Still then proceeded to inquire about Adrian Rodriguez, Mr. Gerenis' former subordinate when he was Director of Sales and Leasing.

50.  Mr. Still asked Mr. Gerenis if Mr. Rodriguez would find him

"attractive as a daddy." Mr. Gerenis informed Mr. Still that Mr. Rodriguez was not gay and could not provide information on who was and wasn't gay.

51.  Mr. Still grew increasingly more aggressive and still had his hand on Mr. Gerenis' genitals. Mr. Still then proceeded to unbutton Mr. Gerenis' pants and insert his right hand into Mr. Gerenis' pants and proceed with physically manipulating Mr. Gerenis' genitals and anus.

52.  Mr. Gerenis sat there, afraid, and unsure of how to react. Upon completion, Mr. Gerenis didn't say anything and tried to get up and leave.

53.  Mr. Still quickly made it to the door and proceeded to block his exit. Mr. Still's office only has one entry/exit, and with him physically blocking the entrance, Mr. Gerenis was trapped.

54.  Mr. Still was still physically aroused, and Mr. Gerenis could see the imprint of his erection. Mr. Still placed his hands-on Mr. Gerenis' shoulders and, in a threatening voice, asked if Mr. Gerenis had anything he wanted to say.

55.  Mr. Gerenis responded that he wasn't lying about knowing who was and wasn't gay but that he would ask around and figure it out and get back to him.

56.  Mr. Gerenis reiterated to Mr. Still that he would speak further with Mr. Rodriguez to see if there is any chance there. Mr. Still released his hands from Mr. Gerenis' body and positioned himself away from the door allowing Mr. Gerenis to leave.

57.  On September 20, 2018, Mr. Still was walking past Mr. Gerenis' office, stopped and insisted that Mr. Gerenis go for a drink with him. Mr. Gerenis refused as it was after hours, and he had plans at home.

58.  Mr. Still insisted that it was work-related, and that Mr. Kyle Eaton would be in attendance as well. Mr. Gerenis attempted to decline again, but Mr. Still emphasized that he would pick Mr. Gerenis up from home in 30 minutes.

59.  Mr. Still knew where Mr. Gerenis lived as he lived in a company-owned house provided for him. Mr. Still would later arrive at the home and pick Mr. Gerenis up with Mr. Kyle Eaton already in the passenger seat.

60.  Mr. Still requested that Mr. Gerenis sit up front, but Mr. Gerenis declined and asked to sit in the back to create distance away from Mr. Still. Mr. Eaton kept the front seat instead.

61.  Throughout the night, Mr. Still touched Mr. Gerenis against his will, groped and manipulated his genitals, showed his erect penis through his pants.

62.  Mr. Still forced Mr. Gerenis to drink alcoholic beverages against his will. Mr. Still instructed Mr. Eaton to put the meal and some drinks on the company credit card, and Mr. Still would be the one to approve it when the report came across his desk.

63.  Additionally, Mr. Still opened a separate tab on his personal credit card and instructed the waiter to keep filling up Mr. Gerenis' wine glass without Mr. Gerenis asking for more.

64.  Afterwards, Mr. Still insisted on taking Mr. Gerenis and Mr. Eaton out for ice cream at Karma Cream on University Avenue. Mr. Still then proceeded to tell Mr. Gerenis that it was apparent he was riddled with anxiety and that Mr. Gerenis needed to relax.

65.  Mr. Still told Mr. Gerenis that he needed to take the medicine the doctors prescribed him and that it was apparent Mr. Gerenis was not himself and wasn't in the best mental state. Mr. Still made these comments with Mr. Kyle Eaton in attendance.

66.  After asking multiple times to be taken home, Mr. Still took Mr. Gerenis home first and Mr. Eaton afterward. Mr. Eaton was in attendance for the entirety of the evening.

67.  In December 2018, Mr. Gerenis discussed the issues he was having with the house the company provided for him to live in at 2227 NW 9th Place, Gainesville, FL, with Mr. Still as he was the head of operations for the company.

68.  Mr. Gerenis informed him that he discovered an extreme mold issue at the house that needed rectifying. Mr. Still responded that it could all be remedied rather quickly if Mr. Gerenis were to "make it worth my time."

69.  Mr. Gerenis uncomfortably laughed and again reiterated that he needed his assistance in removing the mold. Mr. Still responded that he would get to it.

70.  Mr. Gerenis pressed once more and asked Mr. Still when he planned on fixing the mold issue. Mr. Still grabbed his crotch and winked at Mr. Gerenis, and responded, "Is it worth my time yet?" to which Mr. Gerenis did not respond.

71.  In December 2018, Mr. Gerenis went back to follow up with Mr. Still about the issues with mold in the house. Mr. Still proceeds to ignore Mr. Gerenis' requests for an update and proceeded to talk about Mr. Gerenis' training programs.

72.  Mr. Still had recently taken away some of Mr. Gerenis' job responsibilities and given them to his colleague Kristen Koon. Mr. Gerenis attempted to inquire about an update on the mold situation, and Mr. Still refused to give an update.

73.  Mr. Gerenis reminded Mr. Still that company supervisors, the majority of the executive team, and the owner himself were non-compliant with sexual harassment training.

74.  Mr. Still scoffed at Mr. Gerenis and stated that it didn't apply to them. Mr. Gerenis then moved on to his last item on his agenda, which was approved for Mr. Adrian Rodriguez and Mr. Malcom Lindor to attend the Conference of Champions, an annual conference put on by the Human Resources department.

75.  Mr. Still immediately approved Mr. Lindor and then switched the conversation and started to grill Mr. Gerenis on Mr. Lindor as he was aware that Mr. Lindor and Mr. Gerenis had worked together in the past.

76.  Mr. Still then badgered Mr. Gerenis on whether or not Mr. Lindor would find him attractive. Mr. Gerenis informed him that he did not know and attempted to switch the conversation back to getting approval for Adrian Rodriguez.

77.  Mr. Still then asked if Mr. Rodriguez was "gay yet," and Mr. Gerenis proceeded to answer no. Mr. Still replied, "oh well, if he isn't playing for my team, then he's of no use to me."

78.  After that comment, Mr. Gerenis quickly responded that he would notify Mr. Rodriguez that he was not approved, and Mr. Gerenis stopped asking about the mold in his house and proceeded to leave.

79.  In or around February 2019, Mr. Gerenis was feeling ill and worried that the mold is spreading and decided to get a professional opinion to see if it would help convince Mr. Still to rectify the mold issues.

80.  Dan with Best Restoration services met with Mr. Gerenis during his lunch break at noon on February 26, 2019.

81.  Upon arriving at the house, Dan commented that he had been to the house before and is familiar with the place. Dan proceeded to inform Mr. Gerenis that Best Restoration had already been out to the house and already notified the company of the mold and the remediation needed.

82.  Mr. Gerenis asked Dan if he would be willing to give Mr. Gerenis another estimate as he was unaware that they had been out there before Mr. Gerenis moved in. Dan inspected the house again, showed Mr. Gerenis all the mold growth and areas of concern and e-mailed Mr. Gerenis an estimate that he could take to Mr. Still.

83.  After Dan left the house, Mr. Gerenis proceeded to call Mr. Still on his cell phone. Mr. Kyle Eaton was with Mr. Still and privy to their conversation.

84.  On the call, Mr. Gerenis informed Mr. Still that he was to receive an estimate for the mold, and Mr. Still proceeded to instruct him to e-mail Mr. Still and then hung up the phone.

85.  Mr. Eaton would later reveal to Mr. Gerenis that Mr. Still hung up the phone, laughed and said that he would not be fixing the mold issue. When Mr. Eaton inquired why not, Mr. Still replied, "Because it's Anthoné and who cares." Mr. Gerenis would later receive the estimates totaling approximately $5,000 for repair.

86.  In or around early March 2019, Mr. Gerenis was contacted by Adrian Rodriguez, who requested a meeting for March 4, 2019. Mr. Gerenis agreed.

87.  On March 4, 2019, Mr. Rodriguez met with Mr. Gerenis in his office. Mr. Rodriguez stated that he felt unfairly treated by Mr. Still and believed it was because he was the only heterosexual male on the team and wasn't flirting back or reciprocating Mr. Still's advances.

88.  Mr. Rodriguez stated he'd noticed that Mr. Still showed affection and outwardly flirting with one of his male subordinates. Mr. Gerenis let Mr. Rodriguez know that he would take down his concerns and investigate and get back to him.

89.  On March 8, 2019, Mr. Gerenis reached back out to Dan with Best Restoration to see if Mr. Still had approved the estimate, and Dan responded that the company had decided not to move forward with removing the mold. When Mr. Gerenis asked Dan why not, he replied that he doesn't want to get in trouble with anyone at the company and he's just trying to keep his contracts.

90.  Mr. Gerenis hung up the phone with Best Restoration and went to retrieve the signed leasing contract executed between Mr. Gerenis and The Collier Companies. In the following days, Mr. Gerenis met with Mr. Still to remind him that his signed leasing contract stated that the company is responsible for rectifying the issue.

91.  Mr. Still disagreed and stated that Mr. Gerenis "could make it worth my time," followed up with, "I heard you and your partner like to have sex, and you usually invite a third person into the bedroom." Mr. Gerenis offered no response and then asked if he could have a $5,000 payroll loan from the company.

92.  This was not an unusual request as the company has done payroll loans in the past for previous employees with circumstances that required it. Mr. Gerenis proposed that the loan be paid back in ten installments at $500 per paycheck for a total of ten pay periods.

93.  Mr. Still refused Mr. Gerenis and replied that "I'm surprised you haven't invited me into your bedroom yet."

94.  When Mr. Gerenis tried to ask Elizabeth Guynn for assistance, she declined and referred Mr. Gerenis to Mr. Still, stating that he had the final authority.

95.  On or around March 12, 2019, Mr. Gerenis was first notified about sexual harassment involving Mr. Lindor from Mr. Lindor firsthand.

96.  Mr. Lindor made statements about Mr. Still locking Mr. Lindor in his car and caressing his thigh, Mr. Still pressing Mr. Lindor for

information about other gay men in the company and Mr. Still wanting to be Mr. Lindor's "daddy."

97. Mr. Lindor proceeded to tell Mr. Gerenis about concerns regarding a subordinate onsite leasing specialist at Gainesville Place Apartments.

98. Mr. Lindor made a statement to Mr. Gerenis that he told Mr. Still that these leasing specialists looked up to him as a gay man and that after that, Mr. Lindor witnessed Mr. Still arrive unexpectedly at Gainesville Place the next day to speak with this leasing specialist.

99. On or around March 15, 2019, Mr. Gerenis notified The Collier Companies that his doctors with UF Health ordered an endoscopy and colonoscopy and instructed Mr. Gerenis to obtain a sample of the mold in the house he was living in.

100. Mr. Gerenis informed Mr. Still of his doctor's requests, and Mr. Still and the company responded by telling Mr. Gerenis that he needed to move out of the house. Mr. Gerenis informed Mr. Still, and the team that he was scheduled for his operations on Tuesday, March 19th, and they retaliated against him by responding that he had to be out of the house by that Sunday, March 24th.

101.  The company offered $99 for him to go and get a moving truck for himself. Mr. Gerenis later had to hire friends to move him from the mold-infested house to another apartment the company was providing.

83.  The new lease was generated and was supposed to be from 3/23/19 through 7/31/19.

102.  In or around April 2019, Mr. Lindor informed Mr. Gerenis that Mr. Still continued to ask questions about Mr. Gerenis' sex life and whether or not he has been having a lot of sex lately.

103.  Mr. Lindor continued about how Mr. Still was under the impression that Mr. Gerenis wasn't sick but hurt himself having sex and how again he couldn't believe Mr. Gerenis would refuse to have sex with him when he is clearly having lots of sex with others.

104.  On or around April 20, 2019, Mr. Gerenis went to his colleague in Human Resources, Amber Dunaway, the HR Recruiter, as she had been with the company 14 years and trained Mr. Gerenis. Mr. Gerenis informed Ms. Dunaway of sexual harassment from Mr. Still.

105. On or around May 2, 2019, Mr. Gerenis went to Ms. Dunaway's office to elaborate on sexual harassment at the hands of Mr. Still, involving

verbal sexual harassment, physical, sexual harassment and battery and notified Ms. Dunaway of the harassment involving Mr. Lindor.

106. Mr. Gerenis notified Ms. Dunaway that he had informed his partner of the harassment experienced caused by Mr. Still.

107. On or around May 10, 2019, Mr. Gerenis was again in Ms. Dunaway's office explaining situations of sexual harassment and sexual misconduct involving Mr. Still, Mr. Gerenis and Mr. Lindor.

108. In this conversation, Mr. Gerenis notified Ms. Dunaway of the conversation between Mr. Gerenis and Mr. Still, where Mr. Still asks if Mr. Rodriguez is "gay yet" and stated, "oh well, if he isn't playing for my team, then he's of no use to me."

109. On or around May 15, 2019, Mr. Gerenis was in a closed-door meeting with Mr. Lindor when Ms. Dunaway joined. All three discussed the verbal and physical sexual harassment at the hands of Mr. Still, involving both Mr. Gerenis and Mr. Lindor.

110. In this conversation, Mr. Gerenis spoke about the incident in September involving being locked in Mr. Still's car and touched against his will. Additionally, Mr. Gerenis talked about the incident in September involving Mr. Still getting Mr. Gerenis inebriated using the

company credit card and behaving inappropriately with verbal and physical sexual harassment and battery.

111.   Additionally, Ms. Dunaway was notified about behavior between Mr. Still and the leasing specialist at Gainesville Place Apartments against company norms given the power differential between Mr. Still and the subordinate.

112.   On or around May 20, 2019, Mr. Gerenis was again in Ms. Dunaway's office explaining the severity of the situation and harassment involving Mr. Still between Mr. Gerenis, Mr. Lindor, Mr. Rodriguez and the concern regarding the leasing specialist at Gainesville Place Apartments. Ms. Dunaway acknowledged that the harassment was severe and did not trust the Human Resources Vice president or Chief Operating Officer Jennifer Clince because they knew Mr. Still's past and protected him when confronted in earlier months.

113.   Ms. Dunaway informed Mr. Gerenis that coming forward with this information would result in the company harshly retaliating against him.

114.   Ms. Dunaway told Mr. Gerenis of situations in the company's past where previous employees that have spoken up have been severely

punished or terminated. Ms. Dunaway admitted that she was not sure whom to trust and how to help Mr. Gerenis and the others.

115.  Mr. Gerenis notified Ms. Dunaway that he would reach out to the EEOC and file an official complaint as Human Resources at the company failed and the executives were covering up and not able to be trusted. Ms. Dunaway agreed and responded that she would also look into reaching out to the EEOC and submitting her own request for assistance.

116.  On or around the morning of May 30, 2019, Mr. Gerenis was again in Ms. Dunaway's office complaining of fear of retaliation for coming forward about sexual harassment and misconduct and for initiating contact with the EEOC. Mr. Gerenis informed Ms. Dunaway that he began the EEOC complaint process.

117.  On or around the afternoon of May 30, 2019, Ms. Elizabeth Guynn and Michael J. Still threatened Mr. Gerenis in a closed-door meeting. Both stated they had concerns about Mr. Gerenis being able to succeed in his role in the company based on his "mental fitness" and anxiety.

118.  Additionally, they threatened Mr. Gerenis' employment, stating, "It might be best for you to look at some other jobs available to you with other companies" and "it sounds like it won't work out here.'

119.  Mr. Still ended the meeting, saying that they should meet the next day again at 3:30 pm to discuss things further. Mr. Gerenis left that meeting fearful and immediately went to Ms. Dunaway's office.

120.   Mr. Gerenis told Ms. Dunaway he felt attacked and verbally assaulted, threatened in the meeting, and fearful of retaliation. Mr. Gerenis notified Ms. Dunaway that he was leaving the office immediately to go home and finish submitting his request to the EEOC. Mr. Gerenis completed his EEOC initial complaint request.

121.  On or around the morning of May 31, 2019, Mr. Gerenis is in Ms. Dunaway's office and notified her that he had completed the EEOC complaint and received confirmation and an appointment with an EEOC investigator. Ms. Dunaway responded that she had gotten as far as the EEOC website but hadn't submitted anything. Mr. Gerenis offered to help and told Ms. Dunaway he could show her later when they weren't on company time.

122. Mr. Gerenis would later go on to be fired on 5/31/19 and kicked out of the apartment against his will, and executed lease. His keys were turned in on 6/19/19.

123.  On or around 3:20 pm on May 31, 2019, Mr. Gerenis and Mr. Still walked to the office of Ms. Elizabeth Guynn and proceeded to close the door.

124.  Ms. Guynn inquired about Mr. Gerenis's thoughts about the conversation between Mr. Gerenis, Mr. Still, and Ms. Guynn.

125.  Mr. Gerenis responded that he was very perturbed that Ms. Guynn and Mr. Still would use Mr. Gerenis' struggles with anxiety as an excuse to call him mentally unstable.

126.  Ms. Guynn responded that Mr. Gerenis has his perception, and Ms. Guynn and Mr. Still have theirs. Ms. Guynn proceeded to say she discussed at length with Mr. Still, and they believe that Mr. Gerenis had a closed demeanor in the weekly company meeting, and they decided they weren't going to move forward with his employment, and they were going to make a change today.

127.  Ms. Guynn stated that she and Mr. Still wished Mr. Gerenis well, and they wished it had been a different situation. Ms. Guynn proceeded to discuss a separation agreement that was effective the day of termination, May 31, 2019. Ms. Guynn and Mr. Still offered Mr. Gerenis $4038.31. and said they would allow Mr. Gerenis to have his housing

concession through June 30th, 2019 and then to start paying rent at market rate as of July 1, 2019.

128.    They offered an additional month for benefits, doctors' appointments, or prescriptions. This was in return for the signed separation agreement.

129.  Ms. Guynn and Mr. Still then asked Mr. Gerenis if he had any questions. Mr. Gerenis responded by asking when the agreement needed to be signed. To which they replied that Mr. Gerenis could sign at his discretion.

130.  Mr. Gerenis then asked Ms. Guynn and Mr. Still to clarify their reasoning for terminating him.

131.    Ms. Guynn and Mr. Still responded they decided yesterday afternoon that they would terminate Mr. Gerenis, and they just needed to get approval from their supervisors.

134.    Mr. Still winked at Mr. Gerenis, and Mr. Gerenis took the separation agreement and placed it in his jacket pocket.

135.  Ms. Guynn and Mr. Still then escorted Mr. Gerenis back to his office, passing Ms. Cari Nipper along the way. Mr. Gerenis said goodbye to Ms. Nipper and continued being escorted away.

137.  Ms. Guynn and Mr. Still then requested Mr. Gerenis start collecting his things and then escorted him out of the building.

138.  Mr. Gerenis repeatedly asked Mr. Still not to touch his personal belongings and that Mr. Gerenis would remove them on his own. When Mr. Still was dropping off the last box of Mr. Gerenis' belongings, Mr. Still attempted to hug Mr. Gerenis.

139.  Mr. Gerenis backed away from Mr. Still and asked him to leave him alone.

140.  Mr. Still replied that Mr. Gerenis should have kept his mouth shut.

141.  Mr. Still winked at Mr. Gerenis, turned and walked away and told Mr. Gerenis good fucking luck. Mr. Gerenis left the premises.

143.  On or around June 12, 2019, Ms. Dunaway sent the following e-mail to CEO Andrew Hogshead with the subject line  ((PRIVATE URGENT)): I wanted to reach out to you to plan a meeting to discuss some high priority issues I have witnessed and/or been informed of. PLD

> Hello Andy, I am requesting a private meeting to discuss with you some very important matters. I have briefly spoken to Jenn Clince twice back on May 22nd and 24th. I have not gone to Betsy as she is sort of the issue and involved. I do not feel safe speaking with anyone else as I feel everyone is looking out for themselves or their "friends". All that I have to tell you without a doubt has filled

me with anxiety, I have been confused on what to do and honestly fear retaliation as I also live in one of NSC personal homes. In the past when I have come forward with any issues within the company and/or about a direct supervisor, I have always either also written up as well and I was even asked to leave a position to keep a job and relocate to Tampa. But, with recent turn of events, I need to let someone know everything I know. I even ask that Jenn Clince not hear of everything I have to say to you until you have heard it all from me yourself, as I feel she also favors one of the individuals and a couple other reasons…

I prefer to meet with you outside of the office to secure my identity. I would also like to see a copy of my personal TM file. I ask this because I have heard a couple of rumors that when things "start to go down" it has been told to me that some documents have been fabricated in files. So I want to know what there is on me before I come forward, so nothing different "pops up".

Breakdown of what I need to speak with you about:
Sexual Harassment involving Mike Still
Fear of retaliation for my job since Anthoné has been termed
I feel I have not been equally paid in my position (equal pay act)
Gender discrimination in recruiting told by Angela and Betsy to look for a "male" when looking to fill the Pam, PM position

144.  After this the CEO Andrew Hogshead responded to Ms. Duanway

with the following response:

1. first item is being addressed. Out of a need to
protect your confidentiality, this will move slowly
at first. I will advise when the process is complete
2. Need to meet with Anthone off-site. Can you
facilitate? Jenn, Betsy and Rachel will need to
meet with you; then Jenn and Rachel will meet
with Anthone, Rachel because she has a good
relationship w/ Anthone (true?)

145. To which Ms. Dunaway responded via e-mail to Mr. Hogshead:

Hello Andy,

… at 4:30 today I was called into Betsys office and
Jenn was there with Racheal. I stood there and
immediately felt intimidated. Basically the jist of
things was that they said that you brought many
things to their attention and they needed to hear
it from me what was what. I stated to them that
well I was told some things would be confidential
and some things I would need to address and so I
asked to know which things they wanted to know
about and I don't remember exactly what was said
on their part but it was along the lines of some
serious things and they wanted to hear what I had
to say so I even at one point asked that you be
present and that wasn't offered.
#2- I did tell them I believe everything i told you
about the sexual assault and other past issues
with ect. It wasn't verbatim of course and even
they said that some things the way you said them
was different the way I said them but I feel the
major topics did get across and they can move
forward with their investigations on the subjects.
They said that I would need to speak with someone
in HR even if it isn't Betsy, it could be Racheal and

> I am okay with Racheal being present if we need
> to speak again with a witness.
> Amber

146.  In or around September 2019, Mr. Gerenis received a phone call from a former Vice president of Operations for TCC, separated from the company a few months before Mr. Gerenis' termination.

147.  This person is under a signed separation agreement with The Collier Companies and proceeded to warn Mr. Gerenis that the allegations he is making are very serious and involve powerful people and their livelihood and that it would be in Mr. Gerenis' best interest to refrain from pursuing the claims any further.

148.  The former VP told Mr. Gerenis that they would hate to see him being a vengeful person and not to do or say anything from now on that Mr. Gerenis would regret later. Mr. Gerenis responded that he was only interested in speaking the truth.

126.  In or around November 2019, Mr. Gerenis received a call from Mr. Lindor.

149.  Mr. Lindor told Mr. Gerenis that Mr. Still was furious and wanted to remind Mr. Gerenis that he has connections and was a very powerful man.

150.  Mr. Lindor stated that Mr. Still told him that Mr. Gerenis better be careful because he is messing with well-connected people, which could be very dangerous for Mr. Gerenis.

152.  Lindor continued by saying Mr. Gerenis better watch his back. Mr. Gerenis understood this information as a threat.

153.  Defendant employed plaintiff.   Mr. Still was in a supervisory position.  Still had the authority to discipline Plaintiff.  Still subjected Plaintiff to unwelcome sexual harassment.

154.   Plaintiff's sex (male) was a determining factor in Defendant's decision to terminate him.

155.   This conduct also fits the pattern of policy or custom within the Defendant corporation as Defendant knew Still engaged in this behavior, re-hired him, and fired others who reported his conduct.

156.  This unwelcome sexual conduct was sufficiently severe or pervasive to alter employment terms and conditions and created an intimidating, hostile and offensive work environment.

157.  Defendant knowingly and willfully discriminated against Plaintiff on the basis of his sex (male) in violation of the Civil Rights Act of 1964.

158.  Plaintiff was damaged as a result.

159. Additionally, he avers that Defendant's unlawful and discriminatory termination of his employment on account of his gender violates the provisions of the laws of the state of Florida, Florida Civil Rights Act, Florida Statutes § 760 et seq., justifying an award, inter alia, of back pay, front pay, benefits punitive and compensatory damages against Defendant.

160.   Plaintiff was terminated after complaining about sexual harassment.

161.  The employer failed the Plaintiff as it knew or should have known because of the harasser's employment record of sexual harassment and subsequent termination for it and additionally the presence of additional complaining employees.

162.   The company failed to establish effective sexual harassment complaint and response policies at the expense of Plaintiff and multiple other employees.

163.  Defendant failed to enforce sexual harassment training.

164.   Defendant failed to take prompt, appropriate action when confronted with a valid complaint.

165.  The harassment occurred by a supervisor, vice president and 4th most powerful in the organization underneath only the owner, CEO and COO.

## COUNT II: SEX DISCRIMINATION

166.  Plaintiff reavers and incorporates by reference all of the allegations set forth in paragraphs 32 through 152 herein.

167. Defendant employed plaintiff.   Mr. Still was in a supervisory position.  Still had the ability to discipline Plaintiff.

168.  Still subjected Plaintiff to unwelcome sexual harassment.

169.   Plaintiff's sex (male) was a determining factor in Defendant's decision to terminate him.  This conduct also fits the pattern of policy or custom within the Defendant corporation as Defendant knew Still engaged in this behavior, re-hired him, and fired others who reported his conduct.

170.  This unwelcome sexual conduct was sufficiently severe or pervasive to alter employment terms and conditions and created an intimidating, hostile and offensive work environment.

171.  Defendant knowingly and willfully discriminated against Plaintiff on the basis of his sex (male) in violation of the Civil Rights Act of 1964. Plaintiff was damaged as a result.  Additionally, he avers that Defendant's unlawful and discriminatory constructive termination of his employment on account of his gender violates the provisions of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 20003 et seq., justifying an award, inter alia, of back pay, front pay, benefits and punitive and compensatory damages against Defendant.

## COUNT III: RETALIATION

172.  Plaintiff realleges and incorporates in this Count III Paragraphs 32 through 1152.

173.  This is a cause of action for retaliation under the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq.

174.  Plaintiff engaged in statutorily protected activities or opposition as described above.

176.  He suffered adverse employment actions.  These included being terminated from his employment and having his residential lease rescinded.

177.  The causal link between these events is demonstrated, at least in part, by the close proximity in time between events.

178.  But-for the discrimination and retaliation by Defendant's agents toward Plaintiff, he would be employed by Defendant.

179.  Defendant's refusal to accommodate Plaintiff to his proper position was in retaliation against Plaintiff.

## COUNT IV: NEGLIGENT RETENTION

180.  Plaintiff alleges and incorporates in this Count IV paragraphs 32 through 152.

181.  Defendant company owed a duty to its employees to prevent their supervisor and vice president from harming their employees.

182.  Defendant company was aware that its managerial and supervisory vice president harassed and discriminated against Plaintiff on the basis of his sex (male), sex (sexual orientation) and his actions in opposing the sexually charged work environment.

183.  The defendant company breached its duty by failing to supervise its employees to prevent such harassment and discrimination.

184.  Defendant failed to exercise reasonable care to prevent and correct workplace harassment by not enforcing sexual harassment training and

empowering a vice president with a known record of sexual harassment and misconduct.

185.   During Michael J. Still's employment, Defendant became aware of problems with this employee, namely discrimination against gay and heterosexual men, that indicated his unfitness.   They fired him in approximately 2012 essentially for this specific cause and re-hired him a few years later at a higher position and placed him in the supervision of Plaintiff, who had reported his misconduct in 2012 and did not know he would be placed under Still's supervision when Plaintiff agreed to return to Defendant's employment.

186.   Defendant had a duty to supervise its employee adequately.

187.   Defendant failed to take further action, such as discharge.   By failing to do so, Defendant breached its duty to Plaintiff.   This negligence caused Plaintiff's damages.

188.   There has been physical injury to Plaintiff as a result.

189.   See *Metropolitan Dade County v. Martino*, 710 So.2d 20 (Fla. 3d D.C.A. 1998), *Watson v. City of Hialeah*, 552 So.2d 1146 (Fla. 3d D.C.A. 1989) and *Harrison v. Edison Bros. Apparel Stores, Inc.* 724 F. Supp. 185, 1190 (M.D.N.C. 1989).

## COUNT V: NEGLIGENT SUPERVISION

190.   In June 2018, after starting in his new position in Human Resources, Mr. Gerenis became aware that Michael J. Still was re-hired by Defendant in fall 2017 against Dianna Miner's (President) advice in a leadership role as a vice president of Operations.

191.  Still would later go on to become promoted to senior vice president of operations, making him fourth in command behind only the owner (Nathan Collier), then CEO (James Andrew Hogshead) and then COO (Jennifer Clince).

192.  In August 2018, Mr. Gerenis began to suffer from flashbacks and emotional distress surrounding the incident with Mr. Still in his vehicle and continued sexually charged behavior.

193.  In September 2018, Mr. Gerenis began to suffer from not being able to sleep while at home, being on edge and dealing with increased anxiety due to Mr. Still.

194.  Mr. Gerenis began to experience bladder control issues and with the closest Men's restroom being near Mr. Still's office.

195.  Mr. Still would pick on and taunt Mr. Gerenis for his frequent bathroom trips. Mr. Gerenis would suffer additional anxiety with having to use that restroom and would often find alternative bathrooms.

196.  Mr. Gerenis attended mental health therapy sessions paid for by The Collier Companies and approved by VP of HR Elizabeth Guynn and VP of Operations Michael Still.

197.  In or around October 2018, Mr. Gerenis submitted his first quarterly review in his role as Human Resources Trainer. According to statistics approved by Elizabeth Guynn, vice president of operations, Mr. Gerenis taught 25 training classes, trained 529 team members and developed four new training classes to be taught company-wide while enforcing Fair Housing Training and Sexual Harassment Training.

198.  In or around Early October 2018, Mr. Still is promoted to senior vice president of Operations. Mr. Still was now the 4th most powerful person in the company behind only the owner Nathan Collier, CEO Andy Hogshead (Former CEO) and COO Jennifer Clince (Now CEO).

199.  In October 2018, Mr. Gerenis obtained industry certification as an Advanced Facilitator and Training. A three-day course designed to make you a better facilitator, trainer and presenter.

200.   In or around December 2018, Mr. Gerenis submitted his second quarterly review in his role as Human Resources Trainer. According to statistics approved by Elizabeth Guynn, vice president of operations, Mr. Gerenis taught 42 training classes, trained 315 team members, developed a new training class, orchestrated and negotiated a new training contract.

201.   Mr. Gerenis met with Ms. Elizabeth Guynn to inform her that the company was failing to comply with Fair Housing and Sexual Harassment training, and based on records with Grace Hill, the company had been failing for years before Mr. Gerenis assuming the training role.

202.   Mr. Gerenis printed a report that showed that the company executives were consistently non-compliant, with some refusing to take the training after being approached by Mr. Gerenis and re-assigned the training, this included Mr. Michael J. Still, Jennifer Clince and a majority of the executive team members.

203.   Mr. Gerenis recommended the company end their contract with GraceHill and launch with Edge2Learn, a competitor, which would allow the company to do a complete training overhaul all at once while experiencing a 25% reduction in expenses.

204.   Mr. Gerenis notified Ms. Jennifer Clince and requested her signature on the contract and approval of the new training rollout with a deadline for all employees to complete Fair Housing and Sexual Harassment training as soon as possible.

205. Mrs. Clince signed the contract, and Mr. Gerenis set up the entire company and sends reminders about the mandatory deadline for all supervisors to become compliant by the end of January 2019.

206.  In December 2018, Mr. Gerenis made history as the first person in the North Central Florida Apartment Association's history to win the Corporate Support Staff Person of the Year award twice for his work at the Collier Companies. First in 2016 and then in 2018. Their peers nominate nominees, and a group of industry leaders selects the winner.

207.  In January 2019, Mr. Gerenis began the new year with company-wide reminders to all employees across all states about Fair Housing compliance and Sexual Harassment training. 186. Mr. Gerenis assigned all 450+ team members both trainings but assigned a Supervisory version of sexual harassment training to all executives and management-level employees.

208.  Mr. Gerenis sent many e-mail reminders regarding fair housing and sexual harassment training. Mr. Gerenis also noted the executives who refused to take the sexual harassment training as they didn't believe it applied to them, including Mr. Michael J. Still, Elizabeth Guynn, Jennifer Clince and many other executives.

209.  His superiors did not empower Mr. Gerenis to reprimand any team members found not to comply.

210.   Mr. Gerenis provided reports, reported on non-compliant team members and personally had meetings with the Chief Operating Officer Jennifer Clince, vice president of human resources Elizabeth Guynn and vice president of Operations Michael J. Still about the importance of the sexual harassment training and the need to stay compliant.

211.  In January 2019, Mr. Gerenis met with Ms. Elizabeth Guynn about fair housing and sexual harassment training. Plaintiff reminded her of her access to pull the reports and of her noncompliance as well.

212.  Ms. Guynn reminded Mr. Gerenis that he need not tell her what she needs to do.

213.  Mr. Gerenis informed Ms. Guynn of Mr. Still's noncompliance with sexual harassment training and his refusal to comply. Ms. Guynn indicated that the executives were capable of handling themselves.

214.  Mr. Lindor made a statement to Mr. Gerenis that he told Mr. Still that this leasing specialist looked up to him as a gay man and that after that, Mr. Lindor witnessed Mr. Still arrive unexpectedly at Gainesville Place the next day to speak with this leasing specialist.

215.  In this same conversation, Mr. Lindor informed Mr. Gerenis that Mr. Still had expressed that he was angry and hurt that Mr. Gerenis and his partner would not engage in sexual relations with him.

216.  In or around April 2019, Mr. Gerenis had another meeting with Ms. Elizabeth Guynn about sexual harassment training.

217.  Notified that Ms. Guynn, Michael Still, Jennifer Clince and other executives were not compliant with sexual harassment training still and that Mr. Gerenis had assigned the Supervisor version of sexual harassment training.

218.  Mr. Gerenis reminded Ms. Guynn that all executives have access to these records and must stay compliant with the training's Supervisor version.

219. In or around April 2019, Mr. Gerenis had another meeting with Michael Still about sexual harassment training.

210. Mr. Still refused to take the training and told Mr. Gerenis it didn't matter whether he assigned it to him.

211. Today, Plaintiff in trauma therapy and other therapy to address the incidents of sexual harassment and assault.

212. Defendant owed a duty to its employees to prevent their supervisor and vice president from harming their employees.

213. Defendant was aware that its managerial and supervisory vice president harassed and discriminated against Plaintiff on the basis of his sex (male), sex (sexual orientation) and his actions in opposing the sexually charged work environment.

214. Defendant breached its duty by failing to supervise its employees to prevent such harassment and discrimination.

215. Defendant failed to exercise reasonable care to prevent and correct workplace harassment by not enforcing sexual harassment training and empowering the vice president with a known record of sexual harassment and misconduct.

216.  Due to the battery suffered, there have been lost wages and physical injury and impact upon Plaintiff.

## COUNT VI: NEGLIGENT HIRING

217.  Plaintiff alleges and incorporates in this Count VI paragraphs 190 through 211.

218.  Defendant owed a duty to its employees to prevent their supervisor and Vice president (Still) from harming their employees.

219.  Defendant was aware that its managerial and supervisory Vice president (Still) harassed and discriminated against Plaintiff on the basis of his sex (male), sex (sexual orientation) and his actions in opposing the sexually charged work environment.

220. Defendant breached its duty by failing to supervise its employees to prevent such harassment and discrimination.

221.  Defendant failed to exercise reasonable care to prevent and correct workplace harassment by not enforcing sexual harassment training and empowering Still with a known record of sexual harassment and misconduct at their same company during a previous employment tenure for which he was fired for sexual harassment.

222.  Due to the battery suffered, there have been lost wages and physical injury and impact upon Plaintiff.

## COUNT VII: BATTERY

223.  Plaintiff alleges and incorporates in this Count VI paragraphs 32 through 152.

224.  On numerous occasions, Michael J. Still, vice president, intentionally made unauthorized and uninvited physical conduct of a sexual nature through force and verbal threat.

225.  Still engaged in unwelcome sexual contact by genital manipulation, forced genital groping and anal manipulation.

226.  The conduct escalated over time and on one occasion in front of another employee.

227.  Still made intentional and unlawful threats of harmful and offensive sexual contact that escalated into Still acting on those threats.

228.  Still, on multiple occasions, forcibly restrained Plaintiff through confinement and threat of force and without lawful authority to do so.

## COUNT VIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

229.  Plaintiff repeats and realleges by reference to each allegation in Paragraphs 190 through 211 and incorporates the same herein as though fully set forth.

230.  Beginning in approximately 2018 and continuing after that, Defendant knew or reasonably should have known that Michael J. Still was engaging in the unlawful behavior described hereinabove.

231.  At all times material herein, Defendant knew or reasonably should have known, that the conduct, acts, and failures to act of all other supervisors, agents, and employees described hereinabove violated Plaintiff's rights under federal and Florida state and municipal statutes, codes and ordinances.

232.  At all times material herein, Defendant, knew or reasonably should have known, that the incidents, conduct, acts, and failures to act described hereinabove, would and did proximately result in emotional distress to Plaintiff, including, but not limited to, loss of sleep, anxiety, tension, depression, and humiliation.

233.  At all times material herein Defendant, knew, or in the exercise of reasonable care should have known, that unless Defendant, intervened

to protect Plaintiff, and to supervise adequately, prohibit, control, regulate, discipline, and otherwise penalize the conduct, acts, and failures to act, of Michael J. Still as alleged hereinabove, said conduct, acts, and failures to act would continue, thereby subjecting Plaintiff to personal injury and emotional distress.

234.  Defendant, knew, or in the exercise of reasonable care should have known, that unless Defendant intervened to protect Plaintiff, and to supervise, prohibit adequately, control, regulate, discipline, and otherwise penalize the conduct, acts, and failures to act of Michael J. Still as described herein, Defendants' failure to so protect, supervise, and intervene would have the effect of encouraging, ratifying, condoning, exacerbating, increasing and worsening said conduct, acts, and failures to act.

235.  At all times material herein, Defendant, and each of them, had the power, ability, authority, and duty to so intervene, supervise, prohibit, control, regulate, discipline, and penalize the conduct of Michael J. Still as described hereinabove.

236.  Despite said knowledge, power, and duty, the Defendant negligently failed to act to prevent, supervise, prohibit, control, regulate, discipline,

and penalize such conduct, acts, and failures to act, or to otherwise protect Plaintiff.

237.   As a direct and proximate result of the failure of Defendant to protect Plaintiff, and to adequately supervise, prohibit, control, regulate, discipline, and otherwise penalize the conduct, acts, and failures to act of Michael J. Still as alleged hereinabove, said conduct, acts, and failures to act were perceived by them as and had the effect of, ratifying, encouraging, condoning, exacerbating, increasing, and worsening said conduct, acts, and failures to act.

238.   At all times material herein, the failure of Defendant, to protect Plaintiff, and to adequately supervise, prohibit, control, regulate, discipline, and otherwise penalize the conduct, acts, and failures to act of Michael J. Still violated Plaintiff's rights under federal, Florida, and municipal statutes, codes and ordinances.

239.  As a direct and proximate result of Defendants' actions, Plaintiff has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress; he has incurred and will continue to incur medical expenses for treatment by psychotherapists and other health professionals, and for other incidental

expenses; and he has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities.

240. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

241.      Defendant's conduct as described herein was malicious and oppressive and done with a conscious disregard of Plaintiff's rights. Defendant, through its officers, managing agents and supervisors, authorized, condoned and ratified the unlawful conduct of Defendant in this action. Consequently, Plaintiff is entitled to punitive damages from Defendant.

## **DAMAGES**

242. As a direct and proximate consequence of Defendant's unlawful and discriminatory employment policies and practices, Plaintiff has suffered a loss of income, including, but not limited to, past and future wages, benefits, expenses, payment for insurance and various other expenses, punitive damages, pain and suffering and compensatory damages, all to be specified at trial.

## **INJUNCTIVE RELIEF**

243. Plaintiff restates, realleges, reavers and hereby incorporates by reference all allegations of paragraphs 11 through 51, inclusive, herein. Additionally, Plaintiff alleges that Defendant's discriminatory actions herein must be enjoined by this Court in order to force Defendant to comply with the law. It is suggested that the injunction be specific in enjoining Defendant and its employees, agents and representatives.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff respectfully prays for judgment against Defendant as follows:

For a money judgment representing compensatory damages, including lost wages, past and future wages, all other sums of money, including all benefits and any other employment benefits together with interest on said amounts, in addition to tort damages;

For a money judgment representing damages for Defendant's willful violations of law;

For a money judgment representing prejudgment interest, if applicable;

Reinstatement and restoration of benefits upon conditions that Plaintiff and supervisors be enjoined to comply with the law.

That this Court retain jurisdiction over this action until Defendant has fully complied with the orders of this Court, and that this Court require Defendant to file all reports necessary and to supervise compliance with the law that all matters related hereto be done in conformance with the applicable provisions;

For lost monies and damages pertaining to out-of-pocket expenses, primarily related to, but not limited to, medical expenses, and loss of retirement benefits;

For suit costs, including an award for reasonable attorney's fees, expert fees, and for such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiff herein demands a trial by jury of all issues in this action pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated this 15th day of February 2021.

_Kevin F. Sanderson_

_____

Kevin F. Sanderson, Esq.
Florida Bar No. 0598488
Kevin F. Sanderson, Chartered
7717 Holiday Drive
Sarasota, Florida 34321
Tel: (941) 444-1548
Fax: (941) 924-0086
kevin@srqattorney.com
Lead Counsel for Plaintiff